DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SAFECO INSURANCE COMPANY OF ILLINOIS,**
Appellant,

v.

**REBECCA L. HEIKKA,**
Appellee.

Nos. 4D2022-2969 and 4D2023-1916

[November 6, 2024]

Consolidated appeals from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos A. Rodriguez, Judge; L.T. Case No. CACE07-008440.

Mihaela Cabulea of Butler Weihmuller Katz Craig, LLP, Tampa, and Gary J. Guzzi of Akerman LLP, Miami, for appellant.

Joseph R. Dawson of the Law Offices of Joseph R. Dawson, P.A., Fort Lauderdale, for appellee.

WARNER, J.

Appellant, Safeco Insurance Company of Illinois, timely appeals a final judgment for Rebecca Heikka, appellee, following a directed verdict in her favor on her third-party bad faith claim against Safeco. Heikka alleged that Safeco acted in bad faith by failing to settle her claim against Safeco's insured, which resulted in a judgment of over $1 million against the insured.

Reviewing the directed verdict under a de novo standard, we conclude that Safeco acted in bad faith by failing to settle when it had the opportunity to settle the claim within policy limits, even though Heikka had reserved the right to sue the insured for punitive damages. Because Safeco acted in bad faith by unreasonably refusing to settle, we affirm the directed verdict and judgment.

After the directed verdict, Safeco moved to disqualify the trial judge. We agree that Safeco's motion should have been granted. The court then awarded attorney's fees and costs to Heikka's attorneys, which order

Safeco also appeals. We consolidate the appeals for the purpose of this opinion. We reverse the attorney's fees and costs judgment entered after the erroneous denial of the motion to disqualify and remand for a new fees and costs hearing before a different judge.

## Background

Heikka's claim against Safeco's insured arose out of a January 2007 car accident, where the insured's car rear-ended a motorcycle on which Heikka was a passenger. The insured was charged, and later convicted, with driving under the influence of alcohol, and leaving the scene of an accident. Heikka suffered severe injuries, requiring a lengthy hospital stay.

At the time of the accident, the insured had a policy with Safeco with a $25,000 limit for bodily injury. Following the accident, a Safeco claims adjuster reached out to Heikka and was directed to her attorney, Kenneth Cooper. Cooper spoke with the adjuster who advised Cooper of the policy limit. Because Heikka had already incurred $195,000 in medical bills in just three weeks, Cooper told the claims adjuster that any potential release would have to exclude punitive damages, as the insured had been driving drunk. During this conversation, he told the adjuster that he also wanted to preserve any uninsured motorist claims and any potential claims against the bar that had served the insured. A few minutes later, the adjuster called Cooper and told him she was going to tender the policy limit.

On that same day, the adjuster faxed Cooper a letter stating, "This letter will serve as confirmation of our agreement to settle the outstanding claim(s) of Rebecca Heikka for the amount of $25,000.00. Payment and acceptance of this sum is in return for a full and final release of all claims arising out of the above captioned accident." The letter also stated, "If you want to make any changes in this proposed Release Agreement, please forward the changes to my attention and I will have the changes reviewed." The attached release was a standard release for any and all claims. It did not make an exception for punitive damages or claims against anyone else. The fax also had a cover letter saying, "Please review and advise of any changes." Safeco also sent a check for $25,000 separately.

Cooper called the adjuster and told her that he could not accept the release, because any release had to exclude punitive damages, uninsured motorist's coverage, other parties, and potentially dram shop claims. The insured's policy with Safeco did not cover punitive damages, and any uninsured or underinsured motorist claim would have been brought

2

against Heikka's own insurer and not against Safeco. Cooper understood the release proposed by Safeco to completely cap damages of any kind at $25,000, including punitive damages. Cooper told the adjuster that he and Heikka would accept the $25,000 settlement subject to these carve-outs. Cooper testified that the adjuster had agreed to these terms. He then made changes to the release, which are underlined below:

> FOR AND IN CONSIDERATION of delivery of a draft or check to the undersigned in the sum of twenty five thousand dollars ($25,000), the receipt of which is hereby acknowledged, each of the undersigned does hereby and forever discharge [Safeco's Insured] and Safeco Insurance Company of Illinois of and from all claims, demands, damages, actions or causes of action, whether on account of damage to property, bodily injuries, loss of services and companionship of your spouse, or death, resulting or to result from an accident which occurred on or about January 7, 2007 at or near [accident site], except punitive damages and any other potential policies of insurance that may cover [Heikka] including but not limited to any uninsured motorist policies.

> It is understood and agreed that this is a FULL AND FINAL RELEASE in full compromise settlement of all claims of every nature and kind whatsoever, and releases all claims whether known or unknown; suspected or unsuspected.

> Each of the undersigned states that this release has been carefully read by and is signed as the free act and deed of such undersigned.

> This release releases only Safeco and [Safeco's Insured] for the policy limits stated above.

At trial, Cooper testified that he had sent the amended release back to Safeco signed by Heikka. The next day, Cooper testified that he had spoken with the adjuster, who told Cooper the release "looked good." Safeco later claimed to never have received the release. Neither Safeco nor Cooper followed up about the modified release after that point.

Cooper cashed the $25,000 check. Several months later, Cooper filed suit against the insured for compensatory damages, as a predicate to amending to seek punitive damages. The claims adjuster received a call from the insured notifying her that he had been served with the complaint.

3

Safeco retained counsel on his behalf and advised him of his exposure and options.

As Safeco had not received Cooper's amended release, Safeco believed Cooper had agreed to its full release, and moved to enforce that settlement. Cooper responded, writing a letter to Safeco demanding that Safeco honor the settlement which Cooper believed the parties had reached, which only settled the compensatory damages for the policy limits and excluded punitive damages:

> There was a clear agreement to exclude punitive damages and other parties. If your adjuster is claiming that was not the agreement, then we had no meeting of the minds and the settlement should be null and void.
>
> **Further, at this time my client is making formal demand for you to accept the release as it stands pursuant to the agreement between the adjuster and myself.**

(Emphasis added).

The letter also warned that if the release, as amended by Cooper, was not accepted in sixty days, then Heikka would be filing a bad faith claim against Safeco. Heikka also filed a motion to voluntarily dismiss the claim for compensatory damages if the court found sufficient evidence for punitive damages.

Rather than accepting the amended release under the letter's terms, Safeco and the insured sought to enforce the full release in a declaratory action. The trial court denied their claims that a settlement had been reached, instead finding no meeting of the minds.[1] Because the court found no settlement had been reached, Heikka was able to proceed against Safeco's insured for both compensatory and punitive damages. The case proceeded to trial, and Safeco provided its insured with a defense. The jury returned a verdict against Safeco's insured, awarding Heikka $1,169,292.83 in compensatory damages, but the jury did not award punitive damages.

After Heikka secured the jury verdict against Safeco's insured, she moved to amend her complaint to add statutory and common law bad faith claims against Safeco, which the trial court granted. Heikka's bad faith

---

[1] The $205,000 funds provided to Cooper for Heikka were placed in the court's registry.

4

claims against Safeco alleged that Safeco did not negotiate a settlement in good faith, exposing Safeco's insured to a million-dollar verdict instead of a much lower settlement. The court abated the bad faith claim pending appeal of the underlying judgment. This court affirmed the final judgment in *Hernandez v. Heikka*, 305 So. 3d 533 (Fla. 4th DCA 2020).

The trial court then lifted the abatement, allowing the case to proceed to a jury trial on the bad faith complaint. Cooper testified as set forth above regarding his settlement discussions and negotiations with the Safeco adjuster and with the attorney representing the insured.

A licensed insurance adjuster and risk manager testified for Heikka as an expert witness. The expert reviewed the Safeco insurance policy and testified that the policy did not cover punitive damages, meaning Safeco would not have been liable for any punitive damages assessed against the insured. As punitive damages were excluded, Safeco had no duty to indemnify or to defend the insured against punitive damages. He testified that under industry standards, an insurer is obligated to tender the policy limits when the evidence suggests the covered loss will be valued in excess of the policy limits. Further, under industry standards, because the insured was clearly liable, Safeco should have tendered the policy limits to settle the compensatory damages claim, even if that would have left the insured without counsel provided by Safeco to defend against the punitive damage claim.

In its case, Safeco examined the insured, who testified as follows. Safeco had told the insured that it would be settling the case for the policy limits. After the insured was served with the suit, a claims adjuster told him that Safeco would appoint an attorney to represent him. Safeco sent the insured a reservation of rights letter, admitted into evidence, notifying him that Safeco had tendered the policy limits but had not yet received the release back. Safeco's reservation of rights letter further advised the insured of the following. Cooper had sent an amended release preserving the right to sue the insured for punitive damages. The claim would likely exceed the policy limits and, while Safeco had a duty to defend the case, its duty to defend ended with the payment of the policy limits. The letter also explained that, while the policy did not cover punitive damages, Safeco had elected to provide the insured with a defense at this point subject to its reservation of rights, noting that it could withdraw the defense if the parties settled, or the suit was amended so that the only claim being asserted against the insured was one for punitive damages.

The insured recollected having had several conversations with the claims adjuster, but he could not recall the conversations' substance,

other than that Safeco's policy would not cover punitive damages. The insured was sent another reservation of rights letter about three months later which advised him that Cooper had received permission to amend the suit to include punitive damages. This letter did not advise the insured of the offer to settle for the policy limits as to compensatory damages, but excepting punitive damages, which offer Cooper had made right after suit was filed. The letter reminded the insured that the policy did not cover punitive damages, and that, while Safeco would continue to represent the insured in the suit, its representation could cease if all covered claims were settled.

On cross-examination, the insured testified that he did not remember anyone from Safeco explaining to him that the compensatory damage aspect of the case could be settled for $25,000 if Heikka was permitted to file a lawsuit for punitive damages. Likewise, the insured testified that Safeco had not explained to him that no compensatory judgment could have been entered against him for over $1 million dollars had Safeco accepted Cooper's modified release.

Safeco called its own expert on insurance issues, who testified as follows. Even though Cooper had told the claims adjuster that Heikka would only settle for policy limits if the release excluded punitive damages, it would have been customary for the adjuster to have sent the general release without the exceptions. Safeco's expert did not view the release sent by the adjuster as a "take or leave it" offer. However, when Heikka had filed her claim for compensatory damages, which are covered under the policy, this triggered Safeco's duty to provide a complete defense for both covered and uncovered claims. The expert also opined that Cooper's amended release language would have left Safeco and the insured liable for compensatory damages in excess of the policy limits.

The expert further opined that an insurer is not obligated to accept a release of compensatory damages in exchange for the policy limits when punitive damages are reasonably likely, and the company should make the decision that offers the greatest protection to the insured. The expert maintained that an insurer paying out the policy limits to terminate its obligation to the insured when punitive damages are reasonably likely would be putting its financial interests before those of its insured. Although the jury here awarded no punitive damages, it was not guaranteed that the insured would have successfully opposed punitive damages under different circumstances, such as if he was unrepresented.

On cross-examination, the expert admitted that the duty to defend was greater than the duty to cover a claim. In response to a hypothetical

6

question, he also opined that an insurer would not leave its insured without representation by paying out low policy limits in a catastrophic injury situation where punitive damages may also be involved. He noted that the insurer would have no duty to indemnify for punitive damages, the insurer would have a duty to defend any claim which involved both compensatory damages and punitive damages.

After Safeco rested, Heikka moved for a directed verdict. Heikka argued that Safeco had acted in bad faith by refusing to settle the case for anything less than a full release of all claims. By refusing to settle the compensatory claim alone, Safeco exposed its insured to liability for general negligence, while a punitive damages trial would have required the higher standard of gross negligence.

Without allowing Safeco to respond, the trial court granted a directed verdict. The court found that Safeco had not tendered the policy limits, because the check came with a release that did not include the conditions that Cooper and the adjuster had discussed. The court held that because both the insured's liability and the extent of Heikka's damages were clear, Safeco had a duty to settle the general negligence claim for the policy limits, rather than refusing to settle at all based on the desire to release punitive damages as well, where the burden of proof was higher.

Safeco filed a motion for new trial, arguing, among other things, that whether it had acted in bad faith was a jury question. The trial court denied the motion. Safeco also filed a motion to disqualify the judge, relying on multiple incidents during the trial when the judge evinced bias against Safeco. The court denied the motion as legally insufficient.

The trial court entered a final judgment against Safeco for the amount of the excess judgment, minus the $25,000 policy limits that had been held in the court registry. The court also reserved jurisdiction to determine an award of attorney's fees and costs to Heikka. Later, the court held a hearing on this issue and made an award to Heikka for her attorney's fees. Safeco has appealed both the final judgment and the order awarding attorney's fees. We have consolidated these appeals for this opinion.

## Appeal of Directed Verdict and Denial of Disqualification – Case No. 4D2022-2969

### Standard of Review

An order granting a directed verdict is reviewed by the appellate court de novo, with all evidence and inferences of fact viewed in the light most

favorable to the nonmoving party. *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018). "A motion for directed verdict should not be granted unless the trial court, after viewing the evidence in the light most favorable to the non-moving party, determines that no reasonable jury could render a verdict for the non-moving party." *MasTec N. Am., Inc. v. Morakis*, 288 So. 3d 685, 688 (Fla. 4th DCA 2019) (quoting *Houghton v. Bond*, 680 So. 2d 514, 522 (Fla. 1st DCA 1996)); *see also NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1252 (Fla. 4th DCA 2011).

**Insurance Bad Faith**

"Under Florida law, it is clear that an insured or a third-party claimant may bring a third-party bad-faith cause of action when an insurer has breached its duty of good faith and that breach results in an excess judgment being entered against its insured." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 899 (Fla. 2010).

In *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980), our supreme court explained an insurer's good-faith duty in handling claims against its insured:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Id.* at 785 (internal citations omitted).

Later, in *Harvey*, our supreme court explained:

> The obligations set forth in *Boston Old Colony* are not a mere checklist. An insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment. Rather, the critical inquiry in a bad faith is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment.

259 So. 3d at 7.

"In a case '[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.'" *Id.* (alteration in original) (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991)). Further, section 624.155(1)(b)1., Florida Statutes (2007), provides that an insurer "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests" gives rise to a bad-faith claim.

Additionally, offering to tender, or even tendering the policy limits does not automatically insulate an insurer from a bad-faith claim, such as where the insurer unreasonably fails to comply with a time-limited offer or where the insured does not begin settlement negotiations in a reasonable time. *See Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 676–77 (Fla. 2004) (holding that insurer's agreement to tender policy limits before offer expired did not insulate insurer from bad faith, where insurer had not actually tendered policy limits within that time); *Powell*, 584 So. 2d at 14 (holding that bad-faith claim was not precluded where insurer tendered policy limits, because insurer had not responded to settlement offer for over sixty days and after lawsuit had been filed, which jury could find unreasonable).

Contrary to Safeco's position, the obligation to attempt to settle in good faith requires the insurer to do more than just initiate settlement negotiations. *Powell*, upon which Safeco relies, did not hold that an insurer's good-faith duty ends once it initiates settlement discussions, and our supreme court has clarified that "[t]he obligations set forth in *Boston Old Colony* are not a mere checklist." *Harvey*, 259 So. 3d at 7. Thus, Safeco did not fulfill its good-faith duty to its insured merely by initiating settlement discussions. Safeco also had an obligation to "attempt in good

faith to settle [the] claim[] when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." § 624.155(1)(b)1., Fla. Stat. (2022); *see also Powell*, 584 So. 2d at 15 ("[T]he ultimate tender of the policy limits does not automatically insulate an insurer from liability for bad faith."). Thus, the pertinent question is not whether Safeco initiated settlement negotiations or tendered the policy limits to Heikka, but whether Safeco's insistence on a full release of claims against its insured, when Heikka offered to accept the policy limits for a release of all claims against its insured *except* for punitive damages, breached its good-faith duty to its insured.

The facts most favorable to Safeco show that the claims adjuster tendered the policy limits together with a release of all claims, which Cooper had already told the adjuster would be unacceptable. After receiving Safeco's proposed release, Cooper reiterated that he would not settle without a carve-out for punitive damages and other parties, and that he would revise the release accordingly.

When Cooper filed suit against the insured, believing that the amended release had been accepted, Safeco maintained that the full release together with the cashing of the settlement check should be enforced. Cooper then wrote to the attorney whom Safeco had appointed to represent the insured, advising him of his discussions with the claims adjuster regarding the modified release, and formally demanding that the modified release be accepted with the exception for punitive damages. Cooper's letter stated that if Safeco refused, the release would be void, and he would demand both compensatory and punitive damages in the personal injury suit and sue Safeco for bad faith. The adjuster advised the insured that he could be liable for punitive damages.

Safeco did not settle. The jury returned a verdict of $1.6 million dollars for compensatory damages and no punitive damages, resulting in a judgment for that amount against the insured.

These facts do not show that Safeco complied with its obligations to its insured under *Boston Old Colony*. Safeco argues that it exercised good faith because its policy did not cover punitive damages. To settle the compensatory damages would have left the insured without representation paid for by Safeco to counter the punitive damage case. Thus, Safeco claims that the choices were difficult, and it was trying to protect its insured, not act in its financial interest.

10

The insured's Safeco policy did not cover punitive damages, and provided that once the policy limits were paid out, Safeco had no obligation to defend the insured on the punitive damage claim, even if suit was commenced with a complaint alleging general negligence and not punitive damages, as is required pursuant to section 768.72, Florida Statutes (2022).[2] Therefore, the choices for Safeco and its insured were: (1) to pay out the policy limits, which would protect the insured from an exorbitant excess compensatory damages verdict, but would expose the insured to a punitive damages verdict without Safeco providing a defense; or (2) to refuse to settle, which would expose the insured to both an imminent excess compensatory damages award and a potential punitive damage award, but with Safeco paying the insured's litigation expenses.[3]

Nothing presented at trial showed that Safeco explained these options to the insured. The insured could not recall Safeco explaining the proposed settlement to the insured or explaining that the proposed settlement would prevent a large compensatory award from being assessed against the insured which would not be covered by Safeco. An insurer has an affirmative duty to advise its insured of any settlement opportunities. *Boston Old Colony*, 386 So. 2d at 785. By not advising the insured of this offer, Safeco breached its good-faith duty to the insured. While Safeco did advise of the likelihood of an excess judgment, Safeco did not explain what that might mean to the insured.

Nor did Safeco present any evidence that it explained to the insured what his exposure to punitive damages might be.[4] Although Safeco did

---

[2] "An insurer's duty to defend arises solely from the language of the insurance contract." *Carrousel Concessions, Inc. v. Fla. Ins. Guar. Ass'n*, 483 So. 2d 513, 516 (Fla. 3d DCA 1986). The policy language provided that Safeco would have no duty to defend once the policy limit had been paid out, as is common in insurance policies, so Safeco contractually would have no duty to defend Heikka's suit, even though it commenced as a compensatory damage claim. *See, e.g.*, *Underwriters Guarantee Ins. Co. v. Nationwide Mut. Fire Ins. Co.*, 578 So. 2d 34 (Fla. 4th DCA 1991).

[3] Although Heikka argues that a third option was available, wherein Safeco could have accepted her amended release and then provided its insured with a courtesy defense against punitive damages, punitive damages were not covered under the policy and an insurer is not obligated to engage in extracontractual conduct to avoid bad faith. *E.g.*, *Greenidge v. Allstate Ins. Co.*, 312 F. Supp. 2d 430, 439–40 (S.D.N.Y. 2004) ("[I]n fulfilling its obligation to evaluate coverage, an insurer is not required to engage in extra-contractual conduct.").

[4] Safeco also argues that it would not have been in the insured's best interests to agree to settle for the policy limits with a carve-out for punitive damages, as this would have extinguished Safeco's duty to defend and left the insured without

not cover punitive damages, Safeco should have provided information to the insured to explain how he might minimize his exposure to this excess liability. *See id.* at 785. Particularly, one aspect of punitive damages is that "punitive damages should not be allowed to destroy or bankrupt a defendant." *Wransky v. Dalfo,* 801 So. 2d 239, 243 (Fla. 4th DCA 2001). A standard instruction even informs the jury that in considering the amount of an award the financial ability of the defendant should be considered, and, if the defendant requests the instruction, the jury should be told that it "may not award an amount that would financially destroy (defendant(s))." Fla. Std. Jury Inst. (Civ.) 5.03(2).

In this case, the record does not shed light on the insured's financial condition, except that he is a chef and went to prison for his DUI conviction. Safeco should have at least advised the insured, and should have taken into consideration in its settlement negotiations with Heikka, the possible extent of a punitive damages award for which the insured would have been liable, compared to the size of any compensatory award which the insured could have avoided had Safeco agreed to Cooper's terms. On this record, even with the insured having to pay the cost of his representation in a punitive damage only case, the insured was not well-served by Safeco's refusal to accept the exception for punitive damages. Instead of protecting its insured, by refusing to except the punitive damages claim when it tendered the policy limits, Safeco likely exposed the insured to significantly more risk. Thus, Safeco's decision not to settle violated its own expert's opinion that the insurance company should make a decision which offers the greatest protection to the insured.

*Contreras v. U.S. Security Insurance Co.*, 927 So. 2d 16 (Fla. 4th DCA 2006), supports the directed verdict in this case. In *Contreras*, a pedestrian was struck and killed by a drunk driver who fled the scene. *Id.* at 18. The driver was not the car's owner, but was driving the car with the owner's knowledge and permission, making the driver an additional insured. *Id.* The estate's attorney demanded tender of the policy limits, and the insurance adjuster responded with a letter tendering the policy limits along with a general release form discharging the owner, the driver, and all other potential defendants. *Id.* The attorney responded, offering to accept the policy limits for a release of the owner and the insurer but not the driver, attaching a release form releasing the owner and insurer. *Id.* The attorney advised that the estate was not willing to settle the claim against the driver given the gravity of his misconduct. *Id.*

---

representation and open to liability for punitive damages, which cannot be discharged by bankruptcy. This ignores the fact that the compensatory award also could not be discharged in bankruptcy. 11 U.S.C. § 523(9).

After the deadline to accept the estate's offer had expired, the estate filed a wrongful death suit against both the owner and the driver, resulting in a judgment of $1 million in compensatory damages against both parties and additional punitive damages against the driver. *Id.* at 19. The owner filed for bankruptcy, and her trustee assigned her bad-faith claim to the estate's personal representative, who filed a bad-faith claim against the insurer which proceeded to trial. *Id.* At the close of the personal representative's evidence, the insurer successfully moved for a directed verdict, arguing that it was obligated to act in good faith toward both of its insureds and therefore could not accept a release completely releasing one while leaving the other exposed to a judgment, especially since the settlement was for the policy limits which would exhaust all of the insurer's duties toward the remaining defendant. *Id.* at 19–20.

On appeal, we reversed the directed verdict for the insurer. *Id.* at 22. We rejected the insurer's argument that it faced a Hobson's choice in choosing which insured to prioritize:

> U.S. Security argues that it had an obligation to act in good faith not only towards Dessanti but also towards Dale, because Dale was also covered under the terms of the policy as a permissive driver of Dessanti's vehicle. Clearly, U.S. Security did have an obligation to act in good faith towards both of the insureds. In an effort to fulfill its obligation of good faith, U.S. Security attempted to secure, in exchange for the policy limits, a release for both Dessanti and Dale. Because of the gravity of Dale's misconduct, Contreras was not willing to settle the claim against Dale. Having attempted to secure a release for Dale without success, U.S. Security fulfilled its obligation of good faith towards Dale.

> Having fulfilled its obligation to Dale, U.S. Security thereafter was obligated to take the necessary steps before Contreras's offer expired to protect Dessanti from what was certain to be a judgment far in excess of her policy limits . . . .

> The trial court's concern of placing U.S. Security in a Hobson's choice is not well-founded. The argument that U.S. Security, as a matter of law, could not settle the claim only against Dessanti because it would expose itself to a claim of bad faith by Dale is an illusory one. U.S. Security attempted to settle for both Dessanti and Dale and get a complete release for both of them. A release was unattainable due to Contreras's

adamant refusal to settle with Dale . . . . In any event, the focus in a bad faith case is not on the actions of the claimant, but rather on those of the insurer in fulfilling its obligation to the insured.

*Id.* at 21–22.

Just as the insurer in *Contreras* was obligated to try and obtain a release for the owner once the estate made it clear that it would not release the driver, in this case Safeco was obligated to attempt to settle the compensatory damages claim once it became clear that Heikka would not release the punitive damages claim.

Safeco's evidence in its case did not provide contrary evidence sufficient to submit to a jury. The insured's testimony did not show that Safeco complied with its duty under *Boston Old Colony,* and its expert's basic contention was that it was the insurer's duty to enter into a settlement in the insured's best interests, which did not happen in this case. Because a defendant's wealth, rather than a plaintiff's injury, is an important factor in a punitive damage award, rather than a plaintiff's injury, the insured was exposed to more risk—not less—by Safeco's refusal to settle.

Safeco also argues that the language which Cooper had added to the release would have actually exposed the insured to greater compensatory damages beyond the policy limits. Cooper added the following language: "This release releases only Safeco and [Safeco's Insured] for the policy limits stated above." Essentially, Safeco argues this language would have granted only a $25,000 credit against any compensatory damages.

Settlement offers are construed under general contract principles. *See Suarez Trucking FL Corp. v. Souders,* 311 So. 3d 263, 267 (Fla. 2d DCA 2020) ("General contract principles apply to proposals for settlement and offers of judgment . . . ."), *quashed on other grounds,* 350 So. 3d 38 (Fla. 2022); *see also Feldman v. Kritch,* 824 So. 2d 274, 277 (Fla. 4th DCA 2002) ("Settlements are construed in accordance with the rules for interpretation of contracts."). "When a contract is clear and unambiguous, the court is required to enforce the contract according to its plain meaning." *Feldman,* 824 So. 2d at 277.

In Cooper's addendum, the word "only" clearly modifies "Safeco and [Safeco's Insured]," not "for the policy limits stated above." Thus, the phrase meant that other parties, such as those potentially liable under uninsured motorist policies or dram shop laws, were not released by the tender of the policy limits. This is made even more clear by evidence of

14

Cooper's and the adjuster's discussions. Additionally, after Safeco filed its motion to enforce the settlement, Cooper sent a letter to the insured's counsel stating:

> When we settled the case there was an agreement with your adjuster to exclude punitive damages and other parties than your client and any other parties [sic] insurance companies. Your adjuster has this documented in her computer. She told me on the day we faxed the release to her that she had noted in her computer that we agree to exclude punitive damages. **Therefore, my client only desires to pursue the punitive damages and any other parties than your insured. We agreed to accept the $25,000.00 and exclude punitive damages and other parties from the release**.

(Emphasis added). This letter cleared up any potential ambiguity in Cooper's addendum. The addendum did not increase the insured's liability.

Safeco focuses heavily on arguing that it promptly tried to settle the case and had reason to believe that Heikka had accepted the full release, because Cooper had cashed and disbursed the check. The cashing and disbursing of the check was the subject of Safeco's declaratory action, which was decided against Safeco. Safeco could not relitigate those issues in this case. Nonetheless, when Heikka filed the lawsuit against the insured, it became clear that the parties did not have a meeting of the minds and that no settlement had been reached. Thus, even if it was not clear at first that Heikka was offering to release the compensatory damages claim for the policy limits subject to a carve-out for punitive damages, it was clear after she had filed suit that the release with the punitive damage exception was the only available means to limit the insured's exposure. Cooper's response to Safeco's motion to enforce its purported settlement re-offered these terms. Thus, Safeco acted in bad faith by not accepting Heikka's clear and unambiguous offer to settle the compensatory claims for the policy limits, leaving only a claim for punitive damages. *See* § 624.155(1)(b)1., Fla. Stat. (2022) (providing that a bad-faith claim may be based on an insurer "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests"). We thus affirm the directed verdict.

## Disqualification

During the trial, the judge participated frequently in questioning witnesses. Several times, Safeco's counsel objected and moved for a mistrial. The judge inserted himself into the proceeding frequently, noting that he would simply overrule any objection that counsel may have to his questioning. After the directed verdict, Safeco moved to disqualify the judge citing, among other grounds, the following:

a) The court asking questions of the defense witness designed to bolster the Plaintiff's position about a factual dispute, which questions implied that Safeco had acted in bad faith. Defense counsel had objected, and the court overruled his objection, "emphasizing his authority in front of the jury, undermining the role of defense counsel by stating laughingly that counsel could object all he wanted but his objections were denied. The comment, tone, and demeanor of the judge cause the jury to burst into laughter."

b) During sidebars, the court made arguments on behalf of the plaintiff without waiting for plaintiff to present his objections.

c) The trial judge would correct defense counsel in front of the jury, but he would call a sidebar to address issues with Plaintiff's counsel's conduct.

d) The judge granted a directed verdict without even entertaining argument from defense counsel in opposition to the directed verdict, thus confirming the judge's bias expressed references prior to and during the trial as to the trial judge's inclination to direct a verdict.

Heikka filed a response. The trial court denied the motion as legally insufficient. Safeco raises the denial of disqualification in this appeal.

Whether a motion to disqualify a trial judge is legally sufficient is reviewed de novo. *Louissant v. State*, 125 So. 3d 256, 259 (Fla. 4th DCA 2013). In *Louissant*, we described how a trial court must evaluate a motion to disqualify:

Under Florida Rule of Judicial Administration 2.330, a motion to disqualify must "allege specifically the facts and reasons upon which the movant relies as the grounds for

16

disqualification." Fla. R. Jud. Admin. 2.330(c)(2). The motion must show "that the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge." Fla. R. Jud. Admin. 2.330(d)(1).

"In considering a motion to disqualify, the trial court is limited to 'determining the legal sufficiency of the motion itself and may not pass on the truth of the facts alleged.'" *Riechmann v. State*, 966 So. 2d 298, 317 (Fla. 2007) (citation omitted). "In determining legal sufficiency, the question is whether the alleged facts would 'create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial.'" *Id.* at 317–18 (citation omitted). The fear must be objectively reasonable, and not subjective. *Parker v. State*, 3 So. 3d 974, 982 (Fla. 2009). "If the motion is legally sufficient, the judge shall immediately enter an order granting disqualification and proceed no further in the action." Fla. R. Jud. Admin. 2.330(f).

*Id.* at 259.

Having reviewed the transcript of the trial, we conclude that the questioning by the judge was extensive and sought to establish facts which would tend to favor the plaintiff's position.

"Excessive participation of the trial judge, such as by excessive questioning of witnesses, may amount to usurping the functions of counsel and be an abuse of the discretion and latitude of the court in such respects, with resultant injury to the rights of a party or parties." *Bumby & Stimpson, Inc. v. Peninsula Utils. Corp.*, 169 So. 2d 499, 501 (Fla. 3d DCA 1964). "The very status of the judge as interrogator inevitably means that the answers given by the witness will assume an importance in the minds of jurors otherwise lacking if counsel had instead asked the questions." *Moton v. State*, 659 So. 2d 1269, 1270 (Fla. 4th DCA 1995).

*Gonzalez v. Mercy Hosp., Inc.*, 738 So. 2d 955, 957 (Fla. 3d DCA 1999), *reh'g denied, clarification granted* (June 23, 1999). The participation of the judge in this case, which appeared to favor the plaintiff, would create a reasonable fear in Safeco that it would not receive a fair trial before the judge. Moreover, when counsel tried to object, the court dressed down defense counsel in front of the jury, evoking laughter from the jury. Humiliation of counsel in front of a jury is sufficient to create a reasonable

fear in a litigant that it will not receive a fair trial before the judge. *See Gates v. State*, 784 So. 2d 1235, 1237 (Fla. 2d DCA 2001).

Finally, while the adverse ruling on the motion for directed verdict is not grounds for disqualification, *see Barwick v. State*, 660 So. 2d 685, 692 (Fla. 1995), ruling on the directed verdict without allowing the defense to present its response, together with the conduct of the judge throughout trial, also cumulatively reflected prejudice against Safeco sufficient to require disqualification.

That the court should have granted disqualification does not require reversal of the directed verdict. When disqualification is required, vacation of prior rulings is not mandatory. *See* Fla. Gen Prac. & Jud. Admin R. 2.330(j). In this case, we have reviewed *de novo* the propriety of the directed verdict, thus removing any taint of perceived prejudice or bias of the trial judge in its ruling. Therefore, our reversal of the denial of disqualification only affects subsequent proceedings which require assignment of a successor judge.

## Conclusion

Safeco failed to fulfill its duties to act in good faith in accordance with *Boston Old Colony* when it refused Heikka's offer to settle her compensatory damages claim for the policy limits, subject to a carve-out for punitive damages. In doing so, Safeco increased the exposure of its insured, as he faced the possibility of both an excess compensatory damages judgment and punitive damages judgment against him. The trial court did not err in granting a directed verdict. We also affirm as to all remaining issues except the denial of the trial judge's disqualification, which we reverse. We direct that a successor judge be appointed to hear all subsequent issues in this case, including attorney's fees and costs.

## Appeal of Attorney's Fees and Costs Award – Case No. 4D2023-1916

After the entry of the final judgment in favor of Heikka, her attorneys moved to assess attorney's fees and costs against Safeco. The court held a hearing and entered a judgment for attorney's fees awarding $825,000 in attorney's fees, plus costs. Because we have reversed the trial court's denial of disqualification and remanded for further proceedings before a successor judge, we also reverse the judgment of attorney's fees and costs and direct that the issue of attorney's fees and costs be heard by the successor judge.

Although much of the assessment of attorney's fees and costs was based upon credibility of the witnesses which will have to be reheard, we do note that assessment of attorney's fees for the underlying tort litigation between Heikka and the insured was error as a matter of law. "Under the American rule, 'a court may only award attorney's fees when such fees are expressly provided for by statute, rule, or contract.'" *Q.H. v. Sunshine State Health Plan, Inc.*, 305 So. 3d 543, 546 (Fla. 4th DCA 2020) (quoting *Bane v. Bane*, 775 So. 2d 938, 940 (Fla. 2000)). While Heikka argues that Safeco already stipulated that she was entitled to her attorney's fees from the tort case, Safeco only stipulated that Heikka was entitled to reasonable attorney's fees under section 624.155(7), Florida Statutes (2023). That section provides: "Upon adverse adjudication at trial or upon appeal, the authorized insurer shall be liable for damages, together with court costs and reasonable attorney's fees incurred by the plaintiff." *Id.*

Section 624.155(11), Florida Statutes (2023), also provides that "[t]he damages recoverable pursuant to this section shall include those damages which are a reasonably foreseeable result of a specified violation of this section by the authorized insurer and may include an award or judgment in an amount that exceeds the policy limits." The Fifth District has held that section 624.155 does not provide for the plaintiff to recover his own attorney's fees for prosecution of the underlying tort suit. *Dunn v. Nat'l Sec. Fire & Cas. Co.*, 631 So. 2d 1103, 1108 (Fla. 5th DCA 1993), *receded from on other grounds*, *Boozer v. Stalley*, 146 So. 3d 139 (Fla. 5th DCA 2014). We agree.

Therefore, we reverse and remand for a new hearing on attorney's fees and costs before a successor judge. In that new hearing, the judge may not include attorney's fees incurred in the underlying tort litigation.

*Affirmed in part; reversed in part as to Case No. 4D2022-2926.*

*Reversed as to Case No. 4D2023-1916.*

MAY and CONNER, JJ., concur.

\*          \*          \*

**Not final until disposition of timely filed motion for rehearing.**